UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-

                                    16-Cr-403 (004) (JFB)

ELMER LOPEZ,

        Defendant.
------------------------------------------------------------X

## DEFENDANT'S SENTENCING SUBMISSION

                                    Florian Miedel
                                    MIEDEL & MYSLIWIEC LLP
                                    80 Broad Street, Suite 1900
                                    New York, New York 10004
                                    (212) 616-3042
                                    fm@fmamlaw.com

                                    Joshua L. Dratel
                                    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
                                    29 Broadway, Suite 1412
                                    New York, New York 10006
                                    212-732-0707
                                    jdratel@joshuadratel.com

                                    December 4, 2018

## INTRODUCTION

On March 26, 2018 Elmer Lopez pleaded guilty before Your Honor to count one of the superseding indictment, which charged him with racketeering in violation of 18 U.S.C. § 1961(1)(5), and specific racketeering acts of aiding and abetting the murder of Jose Pena and the attempted murder of John Doe. We submit this memorandum in anticipation of Mr. Lopez's sentencing, scheduled for December 18, 2018. The parties agree that Mr. Lopez's total offense level is 40, his criminal history category is I, and that his applicable advisory sentencing guideline is 292-365 months' incarceration. There is no mandatory minimum sentence required.

This Court has had occasion to impose sentence on numerous MS-13 members, many of whom were convicted of committing unspeakable crimes. As a result, the Court has presumably heard every story of hardship in El Salvador or Guatemala, and has encountered virtually every imaginable nuance in culpability. And yet sentencing must be individually tailored, and each individual defendant's circumstances must be independently considered. This is not an easy task, but we urge the Court to examine with a fresh eye Elmer Lopez's case, his background, his level of involvement, and his conduct after his arrest. If one looks closely, there are factors present here that set Elmer Lopez apart from other MS-13 gang members and should give the Court some comfort that society has little to fear from Elmer Lopez in the future. They should also reassure the Court that a sentence below the advisory guideline range is reasonable and fair in this case, and achieves the statutory purposes of sentencing.

Thus, for the reasons set forth below, including Mr. Lopez's personal characteristics, the role he played in the crimes he committed, the effort to avoid undue sentencing disparities, and, importantly, his post-arrest rehabilitation, we respectfully ask the Court to impose a sentence below 20 years. Such a lengthy term (almost unimaginable for a 22-year-old) will be sufficient but not greater than necessary to satisfy the aims of sentencing contained in 18 U.S.C. § 3553(a).

## PERSONAL BACKGROUND[1]

*Early Childhood*

Elmer Lopez was born on September 21, 1997 in San Salvador, El Salvador. The first of two children born to the union of Xiomara Martinez and Edwin Lopez Nufio, Elmer spent his infancy living in the home of his maternal grandmother, Ana Maria Martinez. The relationship between Elmer's parents was volatile. Mr. Nufio was an aggressive alcoholic who was indiscriminate in his violence toward his wife and children. After Elmer was born, Ms. Martinez found safety and stability in her mother's home and hoped to remain there. But the elder Ms. Martinez did not want the responsibility of caring for her daughter and grandchild. Undeterred by Mr. Nufio's history of domestic violence, the elder Ms. Martinez forced Ms. Martinez and Elmer to move in with Mr. Nufio when Elmer was one year old. When asked about her decision to send her daughter and grandson to Mr. Nufio, the elder Ms. Martinez says, "He [Mr.

---

[1] This section, superficially covered in the PSR, is largely based on the mitigation work performed by the mitigation specialist, Erik Mercer, LSCW.

Nufio] got himself into this, so they were his problem, not mine." Soon after Ms. Martinez moved in with Mr. Nufio, she became pregnant with Edwin, Elmer's brother.

Sporadically employed as a mechanic, Elmer's father, Mr. Nufio, lived in a shed behind his mother's home. Without the space or means to support Ms. Martinez and Elmer, Mr. Nufio was forced to rely on his mother, Marina Lopez, to house them. Ms. Lopez resented their presence in her home, and Elmer and Edwin both remember their paternal grandmother as a distant and sometimes hostile figure in their lives who did little to address Mr. Nufio's alcoholism and violent behavior. The apparent resentment that Mr. Nufio felt about Ms. Martinez's presence led to frequent, brutal beatings, often in front of the children. Elmer recalls that his father would turn his rage toward him and his brother if they attempted to intervene and protect their mother. Ms. Martinez is circumspect in her discussions of the abuse that Elmer endured, but she describes it as chronic and severe. Ms. Martinez recalls, for example, that Elmer and his brother both were severely beaten as toddlers for crying while they were teething. Elmer remembers that his mother sometimes set limits when the abuse happened directly in front of her, but that she made no broader effort to protect them. As Elmer and Edwin got older, Elmer bore the brunt of his father's abuse – a dynamic that Edwin attributes to a perception that Elmer was the weaker of the two. Edwin says, "Elmer was always a breath away from violence."

When Elmer was nine years old, his mother fled to the United States, leaving him and his brother in the care of Mr. Nufio and his family. Without Ms. Martinez's mediating presence, the neglect and abuse to which the boys were subjected escalated.

For Elmer, the toxicity of the environment was heightened by the fact that his grandmother favored Edwin, something Elmer attributes to Edwin's physical likeness to their father. Elmer recalls that Ms. Lopez sometimes refused to feed him and that she did not buy him basic necessities like she did for Edwin.

Elmer was devastated by his mother's abandonment of him and the fact that she left him and his brother in such an abusive environment without even informing her family in El Salvador of their vulnerability. When Edwin reflects on his mother's departure for the United States, he says, "She left us here so she could build another life in New York. She didn't do what a mother should do."

When Elmer eventually mentioned Mr. Nufio's abusive behavior to his maternal aunt, Rosa Martinez, she immediately arranged for the boys to live with her in their grandmother's former home. The fact that the two brothers accepted Rosa's offer enraged Mr. Nufio and his mother. They abruptly kicked Elmer and Edwin out of their home and severed all contact. Edwin remembers this experience as one of his most painful childhood memories. Edwin says,

> He [Mr. Nufio] beat us with anything he could get his hands on – tree branches, cables, belts, anything. But when he left us at Rosa's, it was more painful than any of the beatings. He just said, 'I don't want to see you again. I'm leaving you here for good.' And that was it. We never saw him again.

Although the abandonment was painful for Elmer and Edwin, Rosa's home was a respite from the fear and uncertainty that they experienced while living with their father. The familiarity of the home that once belonged to their grandmother was comforting and Elmer recalls a brief period during which he was able to live without the

constant threat of attack. But the reprieve from fear was fleeting. Within two months of their arrival, Rosa began receiving kidnapping threats by telephone, a not uncommon experience in El Salvador. The caller threatened to abduct Elmer and Edwin unless Rosa paid a large sum of money. As a consequence, Elmer and Edwin were forbidden to leave the home, and everyone in the family lived in constant dread. Elmer says about the experience,

> Someone must have been watching us because he knew who we were and where we went. He threatened my aunt if she called the police. She put mattresses against all the windows and kept us locked inside until he was arrested.

The perpetrator of the kidnapping threats was arrested several weeks after the initial threat was made. Yet, while the arrest removed the immediate threat, Elmer recalls that nothing was ever the same again. Elmer and Edwin were no longer allowed to leave the home alone. Rosa put severe restrictions on their activity outside of the home and her anxiety remained palpable. The fear of attack that was once confined to Elmer's domestic space was now present outside the home as well. Elmer began having nightmares and developed insomnia. He became hypervigilant when outside the house, imagining that strangers were about to abduct him. Elmer recalls that he and his brother became convinced that a black car in their neighborhood belonged to a kidnapper and describes being terrified anytime they saw it drive by.

*Late Childhood and Adolescence*

Elmer and Edwin remained with Rosa for six years after the kidnapping threats ended. During this period, the neighborhood where they lived began to change. Elmer

6

began to notice young people he had not seen before. Some of the new neighborhood arrivals had tattoos, which, Elmer recalls, was unusual at that time. Elmer says,

> I remember a guy showing up in town with a lot of tattoos. No one had tattoos then so I asked about him. People were saying that the tattooed guys coming into town were dangerous.

Elmer describes feeling a combination of fear and fascination about the new people he began to see in around his home. When one of his friends explained that they were part of a gang called MS-13, and that they offered protection, Elmer was intrigued.

Fearful of the emerging gang presence around her neighborhood, Rosa urged her sister to try to bring the boys to the United States. As a teenager, Elmer was spending more time outside the home and Rosa felt he was at risk. A turning point for Rosa occurred when Elmer was badly beaten up by gang members while in the neighborhood where his girlfriend lived. Elmer describes the event as "very scary," and says that he did not return to the area again. Edwin believes that the assault made Elmer more of a target for gang members. Edwin says,

> They [MS-13] started looking for Elmer. They looked at him more than me because people thought he wasn't as smart. They thought he was easily influenced.

Elmer, even more than his younger brother, suffered from the sense of abandonment he felt. Even though his father beat him, at least his father had played a role in his life. Now, as a teenager, neither his mother nor his father appeared to care about him, or sought to protect him. It does not take a psychiatric evaluation to recognize that Elmer's loneliness, sense of abandonment, and resulting desperation to be part of a group, to be protected (a need exacerbated by his diminutive size) – made

7

him more susceptible to pressure from the gang. Indeed, looking back, Elmer acknowledges the lure of membership, protection and belonging that the gang offered him, and that he so badly missed at home.[2]

*Immigration to the United States*

When Elmer was sixteen years old, in part due to the increasing pressure Rosa was placing on her, his mother arranged for him and his brother to travel to the United States illegally. Elmer was scared to leave, and recalls pleading with this aunt to remain in El Salvador, but says that he was given no choice. On November 5, 2014, Elmer and Edwin were picked up and driven by car to a hotel in Guatemala City with three other people. At 4:00am the following day, they were left under a highway where they boarded a bus to Mexico City. While the beginning of the journey was smooth, Elmer recalls that the conditions became increasingly harsh the further they traveled. Elmer says,

> We traveled from Mexico City in the back of a pick-up truck with a tarp over us. There were so many people and we were all lying on top of each other and it was so hot. It was hard to breathe and we were so hungry.

Elmer and Edwin crossed the border on a motorboat near Reynosa, Mexico and then walked for three days through the desert. As the youngest members of the group, Elmer remembers that he and Edwin had to work hard not to fall behind. The group eventually arrived at a warehouse in Texas where they were divided up according to

---

[2] The Court is undoubtedly aware of the social science literature and studies that correlate poor outcomes – including criminal conduct and violence – for persons who are exposed to violence in their youth. Here, Elmer experienced extreme violence both personally and as a witness in El Salvador as a whole.

their ultimate destination. Elmer and Edwin arrived in New York a few days later by car.

### *Life in New York*

The brothers' adjustment to New York was difficult.  Elmer recalls questioning why their mother brought them to the United States at all because her demeanor did not suggest that she wanted them in her home. Edwin says about his mother,

> A mother who doesn't raise you won't love you like a mother who did. My mom was never around to show us that she cared. She built a life for herself here instead – and she was not going to jeopardize it for us.

Ms. Martinez had started a new family in the United States, unconnected to her prior life and family in El Salvador, and Elmer felt that alienation keenly.  He describes a particular tension with Mr. Garcia, his mother's new husband, whom he felt wanted him out of the house. Edwin also observed that tension and believes that Mr. Garcia effectively pushed Elmer to the streets with no objection from Ms. Martinez.

Despite these difficulties, Elmer made a concerted and sincere effort to build a productive life in the United States. Given a choice to go to school or to work, Elmer chose to work.  Within a few months of his arrival, he found a job as a dishwasher at Applebee's restaurant in Brentwood and soon earned the respect and admiration of his co-workers and supervisors. Elmer began by working three days a week and was quickly promoted to a full-time position. Elmer's supervisor at Applebee's, Osman Garcia, describes Elmer as a "great worker," and says that he was always punctual and willing to work any shift on which he was needed.

During the time period when he was working, Elmer generally avoided contact with MS-13 members. He worked, and went home, and did not spend time hanging out with other teenagers. He had arrived in the United States committed to get away from the violence of El Salvador, and initially succeeded. About 18 months after his arrival in the United States, however, Elmer decided to stop working and to go back to school. He matriculated at Central Islip high school and, ironically, it was at the high school where he fell back into the clutches of MS-13.

## CIRCUMSTANCES OF THE OFFENSE

Elmer Lopez was never a leader. He was a follower. During the attempted murder of John Doe, Elmer sat in the backseat of the car while a fellow MS-13 member in the front passenger seat fired a gun out of the car window at John Doe. For the murder of Jose Pena, Elmer Lopez, who was not a member of the clique that carried out the attack, tagged along and participated. He was friendly with some of the members of the Freeport Locos clique, and was asked to assist in their effort to kill Jose Pena. He did not plan the attack, he did not give orders, he did not recruit members – he participated.

However, as we all know, merely participating is not an excuse or a defense, neither legal nor moral. Elmer Lopez, who was barely 18 years old during these events, did not have the moral strength, the fortitude to resist the peer pressure of those he considered to be his friends and supporters, closer to him than his own family. For

10

those significant failings, he now faces dire consequences. As noted above, there is a multitude of reasons for Elmer's behavior that summer of 2016, easily traceable back to his childhood – the abandonment by his parents, his desperate desire to belong and to be taken care of. Indeed, those reasons exist separate and apart from the difficulty of detaching oneself from the gang, a gang that severely punished those who showed weakness or sought escape from the gang life. When Elmer started attending high school in Central Islip, he could no longer avoid the gang, which knew that he had been a member briefly in El Salvador. Because the clique of which he had been a part in El Salvador, Centrales Locos Salvatruchas ("CLS"), was not as active in Long Island as other cliques, he was essentially pulled into service by more local cliques. He agreed and followed, both because there was suddenly a network of young people who took him in, "protected" him, provided him social comfort in a foreign country where he did not speak the language and even his mother felt like a stranger to him – and because he felt like he had no power to say no. When he was asked to participate in a gang mission, he did so as a subordinate, not as a leader or even as an enthusiastic participant. As a result, he was not given significant responsibility within the gang, but it was certainly expected, indeed demanded, that he take part. Tragically, taking part included the brutal killing of Jose Pena, a fellow gang member, an act that will haunt Elmer Lopez for the rest of his life.

## POST-ARREST REHABILITATION

Many, if not most, MS-13 members remain committed to the gang once they are incarcerated. The gang continues to offer protection within prisons, and dedicated gang members continue to engage in acts of violence behind bars to further the actual or perceived goals of the gang. Elmer Lopez is not one of those gang members. Ever since his arrest in October 2016, he has attempted to distance himself from the gang and from other incarcerated MS-13 members, at significant peril to himself. Instead, he has dedicated himself to God and religion, where he has been able to find some of the comfort and sense of belonging that he previously thought the gang could provide. Attached is a letter from Elmer Lopez to the Court, in which he describes his turn to religion. *See* Exhibit A. Based on our experience with Elmer Lopez over the last 18 months, that conversion appears genuine. He regularly goes to chapel, and speaks in ways about his religion that are convincing and heartfelt.

But Elmer Lopez has done more than "find" religion in prison; he has taken proactive steps to change his life. For one, while this should not be out of the ordinary but, in fact, is for MS-13 members, Elmer Lopez has incurred no infractions in jail. He has never been sent to the SHU, and he has avoided all disciplinary problems that so often plague other MS-13 members. Moreover, he has found work as an orderly at the MDC where he has received consistently positive evaluations. *See* Exhibit B, Evaluation. He has also enrolled in classes at the MDC, where options are limited. *See* Exhibit C, Certificate of Completion.

Elmer's efforts to transform his life have not gone un-noticed by MS-13, and he has faced constant pressure, harassment, and threats. It is almost impossible not to be housed at the MDC with at least some other gang members, and resisting these threats has been difficult. But Elmer Lopez has learned from the devastating consequences of his prior willingness to follow and his prior lack of strength to resist pressure. In this respect – whether through maturity, a development of a moral compass, or religion – Elmer, too, has turned a corner. As difficult as it will be – indeed gang allegiance will likely be even more prevalent in the prison where he will serve his sentence – he is determined to leave that life behind and to continue on a path toward being a productive, moral, member of society.

## CONCLUSION

The senseless murder of Jose Pena is heartbreaking, as is Elmer Lopez's participation in it. Almost everyone involved were children, which is one of the devastating realities of MS-13 and the violence it has propagated. The victims are children, the perpetrators are children, and the horrific crimes are pointless. At the time of Jose Pena's murder, Elmer Lopez was 18 years old. As the Supreme Court has observed,

> Our cases recognize that youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. . . A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.

13

*Johnson v. Texas*, 509 U.S. 350, 367 (1993) (internal citations and quotations omitted); s*ee also United States v. Singh*, 877 F.3d 107, 117 n. 5 (2d Cir. 2017).

One can readily measure the progression of Elmer Lopez from scared, abandoned, physically abused child in El Salvador, to becoming a largely passive member of MS-13, seeking the comfort and protection of the group, while trying to avoid playing an outsized role in the gang. One can readily understand how these factors, mixed together in an immature, traumatized, and youthful brain, could have led Elmer Lopez to the clearing in the forest where Jose Pena was stabbed to death, feeling that he had no choice but to participate.

It is also clear that these facts do not diminish the extremely serious nature of the offense, the need for just punishment, and the hope that a lengthy sentence will have a deterrent effect on others walking down the same path. The difficult question before Your Honor, however, is just how lengthy that sentence must be. Is 27 years, as recommended by the Probation Department, the right number, or can it be some years less and still accomplish these important goals?

In analyzing that question, we urge the Court to consider Elmer Lopez's post-arrest conduct, because we believe it sheds a light on his state of mind and provides some clue about the likelihood that he will emerge from prison rehabilitated, not hardened. Shedding the MS-13 cloak of belonging and security is no easy task, especially in pretrial detention, both because of the psychological sense of being alone without the gang (and without protection in jail), and the very real fear of retribution for rejecting the gang. As soon as Elmer Lopez was imprisoned, he made the conscious

14

decision to change his life.  In the limited ways that are possible in prison, he stopped communicating with other MS-13 members, he started reading the bible, attending chapel, working for pennies, which he spent in part to speak to an outside chaplain about his religious transformation.  He resisted entreaties and threats by MS-13 members to rejoin the fold.  And he thinks daily, hourly, about what he has done and seeks forgiveness. He understands that redemption is a life-long process, but a process he is committed to wholeheartedly.

     Elmer Lopez was an 18-year old boy who committed a terrible crime for reasons, while understandable, that do not and cannot excuse him.  Elmer Lopez now is a 21-year old man, who is beginning to understand himself better and who has determined that despite the many years he will have to spend in prison, he is and will remain on a righteous path.  Almost all defendants tell sentencing judges that they will change, that they will turn their lives around and become productive members of society. Some do, some do not, and it is therefore always a leap of faith for judges to take them at their word.  However, through his post-arrest behavior, his conduct at the MDC, his letter to the Court, Elmer Lopez has already begun the process of demonstrating to the Court that he means what he says, hopefully making Court's leap of faith a shorter one.

                                     Respectfully Submitted,

                                     /s/

                                 Florian Miedel
                                 MIEDEL & MYSLIWIEC LLP
                                 80 Broad Street, Suite 1900
                                 New York, New York 10004

/s/

Joshua L. Dratel
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006

*Attorneys for Elmer Lopez*

Cc: AUSA John Durham (email)